IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS


UNITED STATES OF AMERICA,

Plaintiff,

Vs.                                    Case No. 05-40040-01-SAC


ROBIN DEAN MURPHY,

Defendant.


MEMORANDUM AND ORDER

This case comes before the court on defendant's motion to

suppress (Dk. 26), and the government's motion to strike (Dk. 88).

Defendant contends that the officers' search of a field adjacent to his

residence constituted an unconstitutional search because it was posted with

"no trespassing" signs.  Defendant additionally contends that the officers'

warrantless search of the house in which defendant lived with his mother

was unconstitutional because no consent was given.  This latter issue

presents a classic credibility contest between the police officers on one

side, and defendant and his mother, on the other side.

**MOTION TO SUPPRESS**

    **Undisputed Facts**[1]

        On July 18, 2003, Lt. Bill Faerber of the Kansas Highway

Patrol observed from a state owned aircraft a cultivated marijuana located

in rural Osage County. Lt. Faerber took a GPS reading of the location,

photographed the area, then forwarded this information to Trp. Dennis

Shoemaker, a KHP liaison, at the Kansas Bureau of Investigation.

        On August 19, 2003, Troopers  Thompson, Stoppel and Bacon

and Osage County Sheriff' Deputy Long went to that location, took

another GPS reading, and made an estimated plant count of over 200.

        The next day, Troopers Thompson, Wright and Shoemaker,

SSA Doug Jorgensen and SSA Patty Bottorff of the KBI checked the

---

[1]These facts are taken from government's exhibits 1-3, which counsel
stipulated to during the evidentiary hearing for the purpose of establishing facts
other than those relating to the issue of consent to search.

property and plants, determined that the plants were cultivated, and

installed an electronic monitoring device in the field. On August 22, 2003,

Troopers Thompson, Shoemaker, and Bacon and SSA Jeff Brandau

checked the area and found it unchanged.  They reset the electronic

monitoring device, which reflected no activity, and left it in place.

On August 26, 2003, Troopers Thompson, Shoemaker, and

Bacon, and SSA Greg Skelton checked the area again. The plants did not

appear to be tampered with and the plant count remained the same. The

electronic monitoring device revealed a white male on a red tractor

spraying plants from the contents of an attached tank. On August 29, 2003,

September 2, 2003, and September 19, 2003 officers checked the area but

on each occasion found it unchanged and found no activity on the

electronic monitoring device.

On September 22, 2003, Troopers Thompson and Shoemaker

checked the electronic monitoring device.  It showed two white males

tending the plants and then leaving the area carrying part of a plant.  On

September 25, 2003, at approximately 9:30 a.m. Troopers Thompson and

Shoemaker and SSAs Skelton, Jorgensen and Smith returned to the area and removed the electronic monitoring device.  It revealed two white males smoking from pipes.

Later that same day, officers went to the house at 7138 E. 197 Street to speak with the residents about the marijuana plot and the persons shown on the video. As the officers entered the driveway, two white males exited the garage. The officers questioned them about the marijuana plot. The men initially denied any knowledge of it, but after having seen the video surveillance tapes, defendant acknowledged he was aware of the plants, but said he did not plant them.  Defendant said that he found the plants about two years ago and had tried to kill them by spraying them with poison.

Evidence relating to consent is disputed.  The court will review the officers' version of events before reviewing the defendant's version of events.

**Officers' version of disputed facts**

Trooper Shoemaker testified that he first spoke with

defendant's mother outside, on a driveway, after she exited a shed and asked "What's going on here?"  He informed her that they were there investigating a cultivated field of marijuana.  Mrs. Murphy then became somewhat emotional and unsteady on her feet and stated, "I don't need this. I just buried my husband a month ago."  Trooper Shoemaker tried to steady her and she leaned on a vehicle, then the two of them entered the shed, which she used to make crafts projects. The two sat side by side as Trooper Shoemaker showed her the three video surveillance tapes of the fields and explained why the agents were there.  Agent Jorgensen remained outside to walk the property for purposes of safety.

Trooper Shoemaker and Mrs. Murphy were alone approximately 15-20 minutes as he located the relevant scenes on the tapes, showed them to her, and spoke with her.  He asked whether the tractor shown in the tape was hers, and after some conversation she admitted it looked like hers.

When Trooper Shoemaker was finishing showing the last tape to Mrs. Murphy, Agent Jorgensen entered the building and said he needed to try to get permission  to search.  Agent Jorgensen and Shoemaker

testified that they then asked Mrs. Murphy for permission to search her property, house and outbuildings to look for items of clothing, marijuana, drug paraphernalia, and such. They told her it was her decision, and that she could refuse. Mrs. Murphy replied, "Yeah, go ahead." Agent Jorgensen offered to take his boots off before entering the house because they were muddy, but Mrs. Murphy said that would be unnecessary. Trooper Shoemaker advised Mrs. Murphy that she could accompany the officers on the search, but got no reply from her. When the agents asked for and received consent from Mrs. Murphy, no show of force was made, no voices were raised, no coercive measures were taken, and no other means of duress were used. The tone was calm and conversational.

Agent Jorgensen then left and told the other agents he had received consent. Marijuana was found drying in the lean-to, items were found in a black mustang, and items of clothing shown in the video were found in the house.

Trooper Shoemaker remained with Mrs. Murphy during the search. Because Mrs. Murphy said she did not know what marijuana

looked like or what kind of items would be associated with it, Trooper

Shoemaker took her outside to a lean-to where officers were, and showed

her some marijuana drying in that building.  They then went to the front of

the residence where he showed her the plants officers had collected from

her field.  During this time, Mrs. Murphy was pretty quiet, and made

statements such as: "I can't believe this.  I don't need this."

      While Trooper Shoemaker and Mrs. Murphy were standing

in the driveway, agents began to reenter the house to take photographs and

collect the evidence they had found.  Mrs. Murphy, upon seeing them do

so, hollered, "What're you guys doing - You can't go in there!"  The agents

stopped immediately.  Trooper Shoemaker testified that he then said to her,

"You gave us permission to search, Margie.  They have bags and are going

in to collect evidence."  Mrs. Murphy responded, " I did not give them

permission to enter unless I was with them."  Trooper Shoemaker replied

that he, not she, had earlier suggested that she accompany officers into the

residence, but he had received no response from her at the time.  He then

said they would enter if she allowed it.[2]

Mrs. Murphy then walked over to the door and accompanied officers into the residence where she led them through the house. She asked why officers were taking certain items, but made no objection to the search or seizure of items and did not attempt to restrict or limit their search or seizure in any way.

Defendant had been seized and was seated on the front porch within 5-15 feet of the front door when his mother objected to the agents' reentry into the home, but defendant did not object or attempt to limit their entry. Defendant had been in that same area when agents first entered the residence, but defendant made no objection or attempt to limit the search or seizure. Defendant never said, "leave my mother alone," and never told them they could not enter the house, but did complain about his back and threaten to sue the agents.

---

[2]Agent Jorgensen testified on rebuttal that Trooper Shoemaker also calmly said, "I could take your tractor. I'm not going to do that. We could take the car. ... You could lose your property because of that marijuana field, but we're not going to do that." This was said because officers believed Mrs. Murphy had no knowledge of the marijuana field and were trying to be compassionate with her.

### Murphys' version of disputed facts

Defendant and his mother both testified to relevant events.
Defendant has lived with his mother since the winter of 2002 in her
residence which was searched.

Mrs. Murphy testified that on September 25, 2003, she was
painting in her crafts shop when the door opened and in walked two men.
Startled and afraid, she asked what they wanted. One said he was an
investigator and asked whether she owned some property on the northwest
side of the road.  She described the land and said "Yes."  He said he had
some tapes for her to watch, to which she replied, "Fine."  She asked him
what the tapes were about, and he said something about a marijuana plot
on her property.

They then walked outside and talked a few minutes.  She
suggested watching the tapes on the patio, but Trooper Shoemaker
preferred the shop, noting that it smelled good.  She agreed to watch the
tapes in her shop, which was air conditioned.  They reentered her shop and
he showed her two videos.  They revealed marijuana plants and "her son or

someone" on a tractor which she said appeared to be hers.  No other agents ever entered the shop, and Trooper Shoemaker never asked her for consent to search anything.

After seeing the videos, the two left the shop and went to the patio where she saw her son sitting on the step and saw her grandson nearby.  She and Trooper Shoemaker sat and were discussing "trivialities" when two men opened the back door to her house.  She jumped up and screamed at them, "What're you doing, going into my house?"  They stopped "dead still" and said nothing.  Trooper Shoemaker told her that they could enter and he had authority for them to go in but she argued with him.  He did not say she had already consented, but said "a lot of bad things," such as he could "go in the housed and... take my boys to jail, he could take my property, he could take everything I she owned, if I didn't let them go in the house."  He was not calm, but very angry.  She cried, and her son remarked, "Leave my mother alone."

She then said, "I will go with you."  She went into and through the house with agents.  She later saw the marijuana outside when some

agent other than Trooper Shoemaker showed it to her.  Mrs. Murphy admits that she "absolutely" needs defendant with her because of her long-term health problems for which she is under the care of five doctors and takes six medications a day.

Defendant stated that he was forcibly seated on the front step at all times during the relevant events, including when two officers other than Trooper Shoemaker or Agent Jorgensen first tried to enter the residence.  He told them, "they could not enter, it was not my home, but they had no permission to enter.  It belonged to my mother."  Officers replied, "We can do anything we choose to," then entered the residence.

Regarding the reentry by agents, defendant testified that when his mother objected, Trooper Shoemaker began making threats, saying "I'll take your farm and put your boys in jail," speaking "like a mad dog ready to bite someone's head off."  Defendant then said, "Leave my mother alone."  Trooper Shoemaker then ordered agents to go ahead and enter the house.

**Search of fields**

Defendant contends that private land posted with "no trespassing" signs, making entry thereon a criminal trespass under state law, should be protected by the Fourth Amendment's proscription of unreasonable searches and seizures. The court does not recall any evidence showing that the land from which the marijuana plants were seized in this case was posted with any sign whatsoever. Defendant has cited neither the transcript of the testimony nor any exhibit admitted into evidence to support his proposition. Accordingly, this argument has no basis in fact.

Assuming, arguendo, that the court errs and has overlooked some reference to "no trespassing" signs posted on the land in question such that some factual basis does exist, defendant's argument is legally unsound. In support of his proposition that a criminal trespass onto land should trigger Fourth Amendment protection, defendant relies upon the dissent, instead of the majority opinion, in the controlling case regarding the open fields doctrine, *Oliver v. United States*, 466 U.S. 170, 195 (1984).

In *Oliver*, as here, the field into which law enforcement officer

entered was posted with "no trespassing" signs.  There, as here, an

unauthorized entry onto the posted land may have constituted a criminal

trespass.  *See Oliver,* 466 U.S. at 183-84.  Nonetheless, the Supreme Court

held that privacy interests, and not property interests, control the analysis

and that no reasonable expectation of privacy exists in open fields.  The

Tenth Circuit has followed suit.

> This Court has found that a person has no legitimate expectation of
>
> privacy even in his own private property where that property is
>
> surrounded by barbed wire fences, even if there are "No Trespassing"
>
> signs posted. *United States v. Rucinski*, 658 F.2d 741, 743-46 (10th
>
> Cir.1981), *cert. denied*, 455 U.S. 939, 102 S.Ct. 1430, 71 L.Ed.2d
>
> 649 (1982).

*United States v. Ruckman*, 806 F.2d 1471, 1473 (10th Cir.1986).

The controlling facts in the present case are indistinguishable

from those in the cases cited above, thus no basis has been shown for

finding the officers' search of the marijuana field unconstitutional.  This

court is obliged to follow what the law clearly is, rather than what

defendant wishes it were, and would be hard pressed to find in defendant's brief[3] a nonfrivolous argument for the reversal of existing law.

**Search of residence**

The government offers no justification for the search of defendant's residence other than consent.  Defendant contends solely that no consent to search was given.[4]

**Consent by defendant's mother**

The law relative to this claim is well established. A warrantless search of a suspect's residence is per se unreasonable under the Fourth Amendment unless the government can show the search qualifies under a

_____

[3]This issue was submitted solely on the briefs.

[4]After this case was briefed, but before the evidentiary hearing was held, the United States Supreme Court held that a physically present inhabitant's express refusal of consent to a police search is dispositive as to him, even when a co-inhabitant expressly consents.  *Georgia v. Randolph*, __ U.S. __ , 126 S.Ct. 1515, 164 L.Ed.2d 208 (Mar. 22, 2006).  At the close of the evidentiary hearing, defense counsel requested and received permission to file a supplemental brief addressing this case.  However, defendant's subsequent brief expressly disavowed any reliance upon the new rule in stating, "defendant realizes that he has no relief under *Georgia v. Randolph*, and therefore will not pursue issues thereunder."  Dk. 87, p. 1.  Thus defendant has chosen to contend solely that no one consented to the search, rather than to contend that the defendant objected despite his mother's consent to a search of their joint residence.

recognized exception, such as a consensual search.  *United States v. Butler*, 966 F.2d 559, 562 (10th Cir.1992). The government has the burden of proving valid consent to a warrantless search.  *United States v. Cody*, 7 F.3d 1523, 1526 (10th Cir.1993).

In this circuit, there is a two-step test involved in determining whether the government has proved the defendant voluntarily consented to the search: "the government must (1) 'proffer clear and positive testimony that consent was unequivocal and specific and freely and intelligently given' and (2) 'prove that this consent was given without implied or express duress or coercion.' " *United States v. Sanchez*, 89 F.3d 715, 719 (10th Cir.1996) (quoting *United States v. McRae*, 81 F.3d 1528, 1537 (10th Cir.1996)).  This determination entails consideration of such factors as: physical mistreatment, use of violence or threats of violence, promises or inducements, deception or trickery, and the physical and mental condition and capacity of the party said to have consented.  *United States v. McCurdy*, 40 F.3d 1111, 1119 (10th Cir.1994).  Another "important" factor is whether the officers told the person that she could refuse consent.

15

*United States v. Orrego –Fernandez*, 78 F.3d 1497, 1505 (10th

Cir.1996). When making this determination, the court should not presume

that the consent was either voluntary or involuntary. *United States v. Soto*,

988 F.2d 1548, 1557 (10th Cir.1993).


### Credibility

Conflicting testimony regarding consent has been offered.

Accordingly, the court's assessment of the credibility of the witnesses is

crucial.   Credibility can be measured by such factors as the witness's

demeanor and inflection and by how reasonable, or how improbable, the

explanations are. *Miller-El v. Cockrell*, 537 U.S. 322, 339 (2003).

Documents or objective evidence may contradict the witness' story, or the

story itself may be so internally inconsistent or implausible on its face that

a reasonable factfinder would not credit it. *Anderson v. City of Bessemer

City, N.C.* 470 U.S. 564, 575 (1985).  Adverse credibility determinations

may appropriately be based upon lack of sufficient detail. *Basnet v.

Gonzales,* 168 Fed.Appx. 278, 282-283, 2006 WL 417499,*4 (10th

Cir.2006).

This case requires the court to credit the testimony of some

witnesses and to reject the credibility of others, although each has told a

coherent and facially plausible story that is not squarely contradicted by

extrinsic evidence.

In assessing the credibility of the witnesses who testified during the

hearing, the court has considered all facts and circumstances shown by the

evidence that affected the credibility of each witness, including the

following factors: the witness' means of knowledge, his ability to observe,

and his strength of memory; the manner in which the witness might be

affected by the outcome of the hearing; the relationship the witness has to

either side in the case; and the extent to which the witness is either

supported or contradicted by other evidence presented during the hearing.

The court first examines Mrs. Murphy's testimony about her

initial meeting with law enforcement officers on the day in question.  The

court finds it implausible that an experienced law enforcement officer

would fail to knock and announce his presence, but would instead simply

open the door and walk into Mrs. Murphy's shop unannounced, surprising

and scaring her with his presence, without any pretense of an explanation

for that warrantless entry.

The court additionally finds it implausible that Mrs. Murphy

was shown the tapes, but was never asked for consent to search.  It is highly

unlikely that Trooper Shoemaker would take 15 or 20 minutes or longer to

show Mrs. Murphy the tapes of the marijuana fields purely for Mrs.

Murphy's edification, merely to satisfy her curiosity, or for some other

charitable purpose.  Instead, it is more plausible to believe that Trooper

Shoemaker's purpose in showing Mrs. Murphy the tapes was to inform her

about what was happening on her property as a prelude to requesting

consent to search of her property.

Similarly, it is difficult to believe that two or more

experienced law enforcement officers would attempt to enter the residence

twice, each time in the presence of its owner (Mrs. Murphy) or occupant

(defendant), without any pretense of consent, warrant, exigent

circumstances, or other purported justification for a search of a residence,

and do so over the objections of a present inhabitant.  This court has heard

hundreds of suppression motions over the years, but has never encountered

a situation in which law enforcement officers attempted to justify their

entry into a residence on the sole basis that "[they] can do anything [they]

choose to," as alleged by defendant.  The court additionally finds it

extremely implausible that officers made not one, but two unauthorized

entries, as alleged by defendant and his mother: the first into Mrs.

Murphy's shop, and the second into their residence.  Whether viewed

individually or collectively, Mrs. Murphy's and defendant's recitation of

events regarding the officers' entry into their buildings is suspect.

       The court additionally finds it significant that while Mrs.

Murphy  accompanied officers through the house as they collected

evidence, she voiced no objection to the search of the residence and made

no attempt to limit the evidence collection.  That fact is undisputed.  The

evidence of the forcefulness with which Mrs. Murphy made her statements

to officers upon seeing them enter her residence, coupled with her

demeanor during her testimony in the courtroom, gives rise to the court's

firm conviction that she is one to speak her mind.  Given her demeanor, it is simply not credible to believe that Mrs. Murphy, who expressly objected to a search when she first saw agents entering her home by "hollering" loudly so that agents all stopped "dead still," would accompany agents on the search throughout her home without further objection to or comment upon their presence there, unless she had previously consented to their search.  Her lack of objection to the search during the evidence collection lends credence to the officer's statement that her objection to their second entry was not because she had never been asked for or given consent, but because she wished to accompany them and erroneously believed she had previously stated that desire.

Additionally, the court cannot overlook the obvious bias Mrs. Murphy had for her son.  She testified that defendant initially came to live with her because she needed him there.  Mrs. Murphy admittedly suffers from chronic health problems, has lost her husband, and by her own admission "absolutely" needs her son there now with her.  In contrast, no such bias was shown on the part of the law enforcement officers in this

case.

The court finds the testimony of the officers that Mrs. Murphy
was asked for consent and gave consent prior to their entry into her
residence  to be generally consistent and persuasive.  Although there were
some minor inconsistencies in the officers' testimony, these involved
insignificant details, innocent errors, or matters not fully inquired about at
the hearing.

The court additionally finds that Mrs. Murphy's consent was
given freely and voluntarily and without implied or express duress or
coercion.  Testimony by Trooper Shoemaker and Agent Jorgensen was
consistent that when they asked for consent from Mrs. Murphy in the shop,
no show of force was made, no voices were raised, no coercive measures
were taken, and no other means of duress were used.  Mrs. Murphy
presented no evidence to the contrary, except to deny that anyone ever
asked her for consent.

Testimony was given about "threats" made by Trooper
Shoemaker, but the court credits the rebuttal testimony of Agent Jorgensen

to the effect that the context of the statements was not threatening, but reassuring.  Even assuming that Trooper Shoemaker's statements constituted threats, such statements were not made, under anyone's version of events, until after officers had already searched the residence pursuant to Mrs. Murphy's consent, and were returning to the residence to collect evidence.  Because the conversation in which the alleged threats occurred, if at all, after consent was given, it could not have affected the voluntariness of the consent.

### Consent valid as to defendant

Lastly, the court further finds that Mrs. Murphy's consent is valid as to the defendant, a co-habitant.  *See Georgia v. Randolph,* __ U.S. __, 126 S.Ct. 1515 (Mar. 22, 2006) (confirming the validity of third party consent "when police obtain the voluntary consent of an occupant who shares, or is reasonably believed to share, authority.") Here, law enforcement officers obtained the voluntary consent of Mrs. Murphy, who had authority to consent to a search of her residence.

The court recognizes that *Georgia v. Randolph*

22

additionally held that a physically present inhabitant's express refusal of

consent to a police search is dispositive as to him, even when a co-

inhabitant expressly consents.  But defendant expressly waived his reliance

upon that new rule in stating, "defendant realizes that he has no relief under

*Georgia v. Randolph*, and therefore will not pursue issues thereunder."

Dk. 87, p. 1.  Because defendant has chosen to rely solely upon his

contention that no one consented to the search, and has expressly waived

reliance upon *Georgia v. Randolph*, the court need not address the new

rule.

But even had defendant properly preserved this issue, the court

would not have extended the new rule of *Georgia v. Randolph* to the facts

of this case.  The court has found that Mrs. Murphy expressly consented to

the search.   There is no dispute that defendant was physically present at the

time of the search, as by all accounts he was seated on a porch near the

door of the residence both times officers entered it.   Additionally,

uncontradicted evidence establishes that defendant was, in fact, an

occupant or inhabitant with his mother of the residence which was

searched.

Nonetheless, defendant testified that he expressly objected to the agent's initial entry into the home by stating, "You cannot go in there. It's not my home, but noone gave you permission.  It belongs to my mother."  The court credits instead the testimony of the officers to the effect that defendant made no such objection.  But even assuming that defendant actually voiced the above-stated objection, this objection is significantly different than the objection made by the co-tenant in *Georgia v. Randolph* who "unequivocally refused" the officer's request to search. 126 S.Ct. at 1519.  Here, defendant was not asked for consent and arguably did not state a personal objection, but instead merely voiced his erroneous belief that his mother had not consented.  This equivocal statement is insufficient to trigger application of the rule that a physically present inhabitant's express refusal of consent to a police search is controlling as to him.

Additionally, no evidence has established that a reasonable officer at the scene would have believed that defendant shared authority

24

with his mother over the premises.  Although officers admitted their initial belief that defendant lived with his mother, in the event the defendant made the statement to the officers as quoted above, defendant's statement arguably disavowed his authority to consent, and conversely, to object, to a search of the residence.  Thus the facts available to the officers at the time of the *pre-Georgia v. Randolph* search would not have warranted a man of reasonable caution in believing that defendant had authority over the premises.  *See United States v. Gutierrez-Hermosillo*, 142 F.3d 1225, 1230 (10th Cir.1998) (the Fourth Amendment is not violated when officers enter without a warrant when they reasonably, although erroneously, believe that the person who consents to their entry has the authority to consent); *Cf Garraway v. Broome County, N.Y.,* 2006 WL 931729, *6  (N.D.N.Y. April 7, 2006) (finding a "good faith defense" available to defendants who may or may not have been deceived as to who held the true legal interest in the home).  For all the reasons set forth above, the court shall deny the motion to suppress.[5]

---

[5]The court finds it unnecessary to address the government's argument that the search was justified by the inevitable discovery doctrine.

**MOTION TO STRIKE**

The government moves to strike defendant's supplemental brief, contending that defendant's brief fails to address, and in fact waives, the sole justification for which the court permitted such a brief to be filed, and instead addresses issues outside the scope of the court's permission. Despite the accuracy of the government's assertion, the court declines to strike the unauthorized pleading, as the government has fully responded to it and has alleged no prejudice.

IT IS THEREFORE ORDERED that defendant's motion to suppress (Dk. 26), is denied, and that the government's motion to strike (Dk. 88) is denied.

Dated this 15th day of June, 2006, Topeka, Kansas.

s/ Sam A. Crow
Sam A. Crow, U.S. District Senior Judge